JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from the court of common pleas concerning the court's affirmation of a board of zoning appeals' ("board") decision to issue a special use permit to defendant Bradley Bay Health Center, a nursing home in the city of Bay Village. Bradley Bay sought the special use permit to build independent living facilities. The board granted the special use permit as being customary and accessory to the permitted use as a nursing home. On appeal to the court, a group of intervenor-residents led by named plaintiff Alex Dade, contested the application for a special use permit on grounds that the proposed nonconforming use would irretrievably change the character of the surrounding residential community. The court found the board's decision to be supported by reliable, probative and substantial evidence. This appeal followed.
 I {¶ 2} We have a very limited standard of review on appeal, which is unlike that employed by the court of common pleas. Under R.C. 2506.04, the court of common pleas is to examine the record to "find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." When conducting this review, the court must apply the law to the evidence that was presented to the board and act as the finder of fact regarding any new evidence. The court must presume that the administrative agency's decision is reasonable and valid. C. MillerChevrolet v. Willoughby Hills (1974), 38 Ohio St.2d 298, paragraph two of the syllabus.
 {¶ 3} Our review is limited to determining whether the court's decision is supported by a preponderance of reliable, probative and substantial evidence. See Kisil v. Sandusky (1984), 12 Ohio St.3d 30,34. This is, in essence, a determination of whether the court abused its discretion in affirming the administrative decision. Henley v.Youngstown Bd. of Zoning Appeals, 90 Ohio St.3d 142, 2000-Ohio-493.
 II A {¶ 4} The underlying facts are undisputed. Bradley Bay Health Center has operated in the city as a nursing home for more than 40 years. It currently has a total of 159 rooms: 126 skilled nursing care units and 33 residential care units. Although Bradley Bay is situated in a residentially-zoned district within the city, its use preexists current zoning law and, at the time this litigation commenced, was permitted by section 1141.01(C) of the Bay Village Planning and Zoning
 {¶ 5} Code ("code")[1]. That section states that any uses or structures in existence at the time of the adoption of the section may continue in use, "and such uses and/or structures may be altered and/or expanded on their present sites or in contiguous lands whether presently owned or not."
 {¶ 6} Code section 1141.02 provides the procedure for implementing an additional use under section 1141.01(C), with several conditions. Chief among them are that the party seeking the additional use must first submit plans to the city planning commission for approval. A decision by the planning commission must then be submitted to the city counsel, which can either approve, disapprove or take no action on the decision, after which time it becomes effective.
 {¶ 7} In the alternative, an applicant may go directly to the board to request a special use permit. Section 1141.04(J) of the zoning and planning code permits "any building structure or use customarily accessory or incidental to a permitted use, on special permit." Under the code, the board may issue a special permit for an accessory use if, after a public hearing, it finds that there are adequate safeguards to preserve the character of the surrounding neighborhood and the proposed building will not harm or adversely affect the neighborhood.
 B {¶ 8} We must consider two interrelated cases as background for this appeal. Bradley Bay first filed an application with the planning commission seeking permission to build 84 additional units on a contiguous parcel of land. Twenty-six units would be used for skilled nursing care, 26 units would be used for assisted living for Alzheimer's care, and 32 units would be used for "independent living."
 {¶ 9} The planning commission rejected the application on grounds that the "proposed project provides for additional uses beyond those that are offered at the existing facility, which is a non-conforming use, and therefore it is not a continuation of the existing use consistent with the provisions provided in Chapter 1141.01(C) that will allow alteration or expansion on the present site or on contiguous land."
 {¶ 10} The city council unanimously affirmed the planning commission. Bradley Bay then appealed to the court of common pleas in CV-554300, alleging among other things that the city ordinances were unconstitutional. The court's docket shows that it affirmed the city council's decision, finding that the orders were not illegal, arbitrary, capricious, unreasonable or otherwise unsupported by probative evidence. The court deferred ruling on the city's constitutional arguments. This case has been stayed, apparently pending the result of this appeal.
 C {¶ 11} Shortly after receiving city councils' decision, Bradley Bay applied to the board for a special permit under section 1121.42 on grounds that its proposed independent living facilities constituted an "accessory use" under code section 1141.04(J). That section permits in a first residence district, "any building, structure or use customarily accessory or incidental to a permitted use, on special permit." Bradley Bay argued that the independent living facilities were an expansion of the current use and therefore permitted on the adjacent property. It represented that the proposed independent living facilities would be customarily accessory or incidental to the current use of the property.
 {¶ 12} At the hearing before the board, Bradley Bay asked the board to review evidence that its expert gave when testifying before the planning commission in the first application. That evidence consisted of testimony to the effect that independent living facilities were a natural outgrowth of dependent care nursing. The expert testified that elder care is viewed as a continuum where seniors can transition from receiving minimal services and care to full dependent care as the need might arise. In this context, he said the term "independent" is something of a misnomer — even when considered "independent," a resident of the facility may receive care in several different forms like meal preparation, laundry, housekeeping and medications. In response to the question of whether independent living units of the kind just described are "customary and incidental" to the use of the property for a nursing and assisted living facility, the expert replied:
 {¶ 13} "Yes. In fact, the State of Ohio has made the termination with that, with regard to allocation of resources, before you can be admitted to a nursing facility, you must go through an assessment process and a PASSPORT program. That is the determinant that you are at that level of care.
 {¶ 14} "Before the PASSPORT program would come into play, there would be independent, communal, community or assisted living. It's all part of the same continuum. People who can afford it can have that kind of care at home, but in order to get 24/7 care at home, the cost is significantly, significantly higher than for assisted living or residential care."
 {¶ 15} In other words, independent living of the kind proposed by Bradley Bay entailed significantly more cost than if a senior were to live on their own. This is because the person would be paying for the additional services offered by Bradley Bay — nursing care, housing, meal preparation — that would be unavailable to a person in a traditional housing arrangement. Hence, the expert noted that the increased cost of independent living was part and parcel of an overall continuum of nursing care-related services.
 {¶ 16} A number of residents whose properties adjoined that of Bradley Bay appeared at the hearing to protest the application for a special use permit. Their concerns were based on aesthetics and the impact the additional units would have on the community.
 {¶ 17} The board approved the application for a special use permit with several conditions not relevant here. Dade appealed to the court of common pleas in CV-560124 and Bradley Bay intervened. As noted, the court found the board's decision to be supported by reliable, probative and substantial evidence.
 III {¶ 18} Dade argues that the court erred by affirming the board's decision to grant the special use permit because the board has no authority to issue a special use permit for an accessory use to a nonconforming use.
 {¶ 19} Dade's argument relates to the 1961 changes to the code. Prior to that year, section 1141.01(C) provided that hospitals could exist in a first residence district as a permitted use. Both parties agree that at the time, Bradley Bay fell within the definition of a hospital. The city amended that provision and deleted the word "hospital." Because Bradley Bay predated this change in the code, it could continue to operate as a nonconforming use pursuant to section 1125.01 of the zoning and planning code:
 {¶ 20} "Except as provided in the Chapter 1125, a lawful building, structure or use existing on the effective date of this Zoning Ordinance may be continued even though such building, structure or use does not conform to the provisions of this Zoning Code for the district in which such building or use is located."
 {¶ 21} It is important to note that even though the city deleted the word "hospital" from the section 1141.01(C) listing of permitted uses in a first residential area, the section went on to state:
 {¶ 22} "For the purposes of uses and/or structures which are in existence at the time of the adoption of this subsection and which will become nonconforming uses and/or structures on account of the adoption of this subsection and the repeal of former subsection 1141.01(C), such amended and/or repealed sections shall continue in full force and effect notwithstanding the adoption of this subsection, and such uses and/or structures may be altered and/or expanded on their present sites or on contiguous lands whether presently owned or not."
 {¶ 23} Section 1125.01 of the zoning and planning code likewise permits the preexisting, nonconforming use by stating, "[e]xcept as provided in this Chapter 1125, a lawful building, structure or use existing on the effective date of this Zoning Ordinance may be continued even though such building, structure or use does not conform to the provisions of this Zoning Code for the district in which such building or use is located."
 {¶ 24} In other words, regardless of whether the section now refers to hospitals or not, Bradley Bay's preexisting use is not only sanctioned under the zoning code, it exists regardless of what changes might subsequently be made to the zoning code (at least insofar as section 1141.01(C) remained on the books) — hence the reference to the preexisting use continuing "in full force and effect." While the city deleted the term "hospital" from section 1141.01(C) in 1961, the specific reference to any preexisting use continuing in full force and effect had the result of permitting the nonconforming use. Because Bradley Bay predated the changes to section 1141.01(C), its use was "grandfathered" and could continue.
 {¶ 25} This does not, however, answer the question of whether Bradley Bay's intention to build independent living units constitutes a permissible accessory use for purposes of attaining a special use permit.
 {¶ 26} We agree that for purposes of section 1141.04(J), Bradley Bay's preexisting, nonconforming use is a permissible use. We reach this conclusion by referencing the title of section 1141.01: "Permitted Buildings, Structures and Uses." That section specifically labels preexisting uses as "nonconforming," and not only permits them to continue in full force and effect, but permits their alteration and expansion on contiguous land.
 {¶ 27} It may appear counterintuitive to assert that a preexisting, nonconforming use can constitute a permitted use. In fact, such a conclusion would go against the current grain of zoning law because of the general principle of law that "zoning ordinances usually contemplate the gradual elimination of nonconforming uses in a zoned area."Petti v. City of Richmond Hts. (1983), 5 Ohio St.3d 129, 130. See, also,City of Kettering v. Lamar Outdoor Advertising, Inc. (1987),38 Ohio App.3d 16, 18.
 {¶ 28} Nevertheless, we construe the law as written. State ex rel.Savarese v. Buckeye Local School Dist. Bd. of Edn., 74 Ohio St.3d 543,545, 1996-Ohio-291. Had the city not wished to define these nonconforming uses as "permitted," it could easily have changed the wording of the law. Since the title of section 1141.01 refers to permitted uses, we must accept that the city intended to sanction preexisting, nonconforming uses under this section as permitted uses. We are, of course, aware that chapter headings are not part of the law of a statute. See R.C. 1.01. However, the heading or title given by a legislative body to a statute must be accorded consideration, as long as it is not employed to alter the meaning of language that is unambiguous. See State ex rel. Murphy v. Athens Cty. Bd. of Elections (1941),138 Ohio St. 432, 435. We interpret the code's meaning by giving effect to the legislative intent. State v. Hairston, 101 Ohio St.3d 308,2004-Ohio-969. In paragraph two of the syllabus of Slingluff v.Weaver (1902), 66 Ohio St. 621, 64 N.E. 574, the court held:
 {¶ 29} "[T]he intent of the law-makers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the law-making body, there is no occasion to resort to other means of interpretation."
 {¶ 30} Bradley Bay's application to construct independent living facilitiesmeets the requirement of section 1141.04(J) to be a permitted use.
 {¶ 31} This finding does not end our analysis. In addition to being a permitted use, the use must also be "customarily accessory or incidental to" the permitted use. Section 1121.03 defines an "accessory use" as "a subordinate use located on the same lot with a principal use and for a purpose customarily incidental to such principal use."
 {¶ 32} The court found that the board relied on reliable, probative and substantial evidence in deciding that the independent living units constituted an accessory or incidental use, and our limited standard of review prohibits us from questioning the court's factual review of the board's decision. While it is incumbent on the trial court to examine the evidence, "such is not the charge of the appellate court.* * * The fact that the court of appeals * * * might have arrived at a different conclusion than the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so."Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd. (1988),40 Ohio St.3d 257, 261.
 {¶ 33} The board heard evidence that independent care facilities of the kind proposed by Bradley Bay were part of a continuum of elder care service. It may be that this concept of independent living predated Bradley Bay's origin more than nearly 50 years ago. However, the board could rationally conclude that the natural evolution of care services for seniors made independent living a next logical step for nursing homes to provide. And it bears noting that Dade presented no evidence to the contrary.
 {¶ 34} We have some trepidation with this finding. By seeking a special use permit under section 1141.04(J), Bradley Bay necessarily concedes that it is not seeking to expand an existing use. The parties agree that if Bradley Bay merely sought to expand the nursing home facilities (the preexisting, nonconforming use), it would be entitled to do so without the need for a special permit. Instead, its application for a special permit is, in effect, a declaration that it wishes to expand beyond the permitted nonconforming use.
 {¶ 35} The city denied Bradley Bay's first application for a permit because the "proposed project provides for additional uses beyond those that are offered at the existing facility, which is a nonconforming use, and therefore it is not a continuation of the existing use consistent with the provisions provided in Chapter 1141.01(C) that will allow alteration or expansion on the present site or on contiguous land." This being the case, it is difficult to understand how Bradley Bay's second application, under section 1441.04(J), could not be more of the same. The applications did not differ in terms of the types of facilities proposed for the property — both sought permission to build 32 independent living units. If the independent living units were not a continuation of the existing nonconforming use, we are at a loss to understand how the board could find that same use to be accessory or incidental to the nonconforming use. Presumably, the city would not want any derivation of an accessory or incidental use to be a continuation of the permitted nonconforming use. How the independent living units can be an accessory to a nonconforming use without being a continuation of that use is a mystery.
 {¶ 36} Nevertheless, we have no legal basis for finding error in the court's affirmation of the board's decision. The board found as a matter of fact that the independent living units are accessory or incidental to the permitted use. Since we lack the authority to question this fact finding, we have no choice but to defer to the board's findings, and the court's review. This limitation likewise prevents us from considering the substance of other assignments of error relating to factual findings by the board. We summarily reject those assignments on that basis, and to the extent that we do not specifically address them, they are overruled.
 IV {¶ 37} It appears that the property upon which Bradley Bay seeks to build its independent living units lies in two differently zoned areas within the city: the aforementioned "first residence district" and "attached residence district." In an "attached residence district," the following buildings and uses are permitted: "[a]ttached Residences including townhouses, four-plexus and other multiple dwellings having separate private entrances." Dade argues that the court erred by affirming the board because the issuance of the special use permit amounts to a zoning change within the attached residence district, in violation of city charter requirements calling for electoral approval of any zoning changes.
 {¶ 38} Dade acknowledges zoning and planning code section 1131.03, which states that "where a lot is located in two or more districts, the provisions of this Zoning Code for the most restricted of such districts shall apply to the entire lot." Nonetheless, Dade argues that this section has been repealed because in 1974 the city decided that any ordinance or resolution affecting a change within a zoning classification or district must be submitted to the electorate for approval. See Bay Village City Charter, Article 7.6(1)(a). The charter also provides that "[a]ll ordinances, resolutions, proclamations, motions and Charter provisions inconsistent with this amendment are hereby repealed." See Bay Village City Charter, Article 7.6(3). This section, Dade maintains, effectively nullifies the provisions of section 1131.03.
 {¶ 39} Dade's analysis of the relevant statutes and charter provisions neglects to acknowledge the extent to which the city can grant permission for an accessory use to a permitted use in either a first residence district [section 1141.04(J)] or an attached residence district [section 1158.05(E)]. The criterion for granting a special use permit in either residence district is the same: the proposed use must be customarily accessory or incidental to a permitted use. So regardless of which residence district is involved, the board has authority to issue a special use permit by using the same criterion.
 {¶ 40} In doing so, the board did not change the zoning in the attached residence district, it merely granted a special use permit to allow an accessory use to a permitted use. In other words, the zoning laws expressly permit the accessory use, so the board's decision to permit that use cannot be said to be a change in the zoning code.
 {¶ 41} In a related argument, Dade maintains that the expansion of a nonconforming use, approved of for first residential districts under section 1141., has no direct counterpart in the context of an attached residential district. He thus reasons that any expansion of a nonconforming use from a first residential district into an attached residential district would amount to an impermissible rezoning of the attached residential district without necessary voter approval.
 {¶ 42} As we stated above, the issuance of a special use permit, as authorized for attached residential districts under section 1158.05, does not constitute a change in the zoning, but permission to engage in a use approved of by the city in its zoning laws.
 V {¶ 43} Section 1141.02(D) of the zoning and planning code states that no building, structure or use enumerated in section 1141.01(C) shall be permitted except on the condition that "[n]o modification or change in any building, structure or use approved pursuant to subsection (c) above, shall be made except upon application to the Commission and after approval thereof as required hereunder for the building, structure or use sought to be modified or changed." Dade argues that the board lacks the authority to grant a special use permit because the planning commission has sole authority to regulate modifications to uses permitted under section 1141.01. Bradley Bay maintains that section 1141.02 regulates a site plan procedure that is irrelevant to the board's very limited inquiry of whether to issue a special use permit.
 {¶ 44} We agree with Bradley Bay that the section relates to the submission of site plans for uses permitted by section 1141.01(C).
 {¶ 45} Section 1141.02 states in part:
 {¶ 46} "No building, structure or use enumerated in C.O. 1141.01(C) of this chapter shall be permitted hereunder except upon the following conditions:
 {¶ 47} "(a) A site plan and general building plan showing the proposed development of the site and lot and the design, location and uses of buildings, structures and open spaces as proposed, together with applications for approval thereof, shall be first submitted to the Planning Commission. On the date of such filing a copy of each of such document shall also be filed by the applicant with the Clerk of the Council and with the Building Commissioner."
 {¶ 48} This section applies only to site plans and general building plans, without regard to the board's authority to issue special use permits. The enumerated powers of both the planning commission and the board are separate and not in conflict. Of course, the board's issuance of a special permit is unrelated to the planning commission's review of site plans and general building plans. Because the planning commission has independent authority to review site plans, it does so without regard to the board's decision to issue a special permit.
 VI {¶ 49} Dade next complains that the board issued the special use permit without reference to the provisions of Chapter 1125 of the planning and zoning code relating to nonconforming uses and structures. Certain provisions of that chapter require the board to make certain findings as a predicate to permitting the expansion of a nonconforming use.
 {¶ 50} Dade refers to section 1125.02, which states:
 {¶ 51} " (A) Use. No expansion of a nonconforming use, or change to any use other than a conforming use, shall be permitted except pursuant to a permit from the Board of Zoning Appeals. Such permit shall be issued only if the Board of Zoning Appeals finds that:
 {¶ 52} "(1) All of the requirements of C.O. 1127.04(D) and (E) have been satisfied;
 {¶ 53} "(2) The issuance of the permit will promote the general welfare of the City; and
 {¶ 54} "(3) The issuance of the permit will not tend to perpetuate a nonconformity which otherwise probably would be discontinued at an earlier date than would be true if the permit is issued."
 {¶ 55} "(B) Building or Structure. No enlargement or change in a nonconforming building or structure except such as will result in a conforming building or structure or except as may be required by the provisions of Chapter 1344 of the Building Code, shall be permitted nor shall any accessory building be erected, enlarged or altered on premises on which a nonconforming main building or structure exists, except:
 {¶ 56} "(1) By the Building Commissioner upon the determination by him that such main building or structure is in conformity with requirements of all ordinances as to setback, yard areas, percentage of lot occupancy, Building Code, and all other applicable ordinances except as to requirements for foundation area and/or livable floor area, and upon the further determination by him that the issuance of the permit will promote the general welfare of the City, or
 {¶ 57} "(2) By the Board of Zoning Appeals upon a determination by the Board that:
 {¶ 58} "(a) All of the requirements of C.O. 1127.04(D) and (E) have been satisfied;
 {¶ 59} "(b) The issuance of the permit will promote the general welfare of the City;
 {¶ 60} "(c) The issuance of the permit will not tend to perpetuate a nonconformity which otherwise probably would be discontinued at an earlier date than would be true if the permit is issued."
 {¶ 61} We take issue with Bradley Bay's characterization of its facilities as "a permitted, not a nonforming use." See Intervenor's Brief at 28 (emphasis omitted). This may seem a small distinction, but there can be no doubt that a hospital is no longer a permitted use in a first residential district. Bradley Bay's use is thus nonconforming, albeit permitted by section 1141.01(C).
 {¶ 62} This characterization is of some moment here, because section1125.02 clearly refers to an enlargement or change of a nonconforming use. However, we note that the city adopted section 1125.02 in 1956. It adopted the more specific section 1141.01 in 1961. While section 1125.02
speaks generally of nonconforming uses, section 1141.01(C) speaks rather specifically to the facts of this case and the preexisting, nonconforming use. Section 1141.01(C) permits Bradley Bay's use to continue in full force and effect, and further permits the alteration and/or expansion of this use on Bradley Bay's present site or contiguous lands, whether presently owned or not.
 {¶ 63} In statutory construction, the specific takes precedence over the general. See R.C. 1.51. Moreover, to the extent that section 1125.02
could be seen as irreconcilably conflicting with section 1141.01(C), we are obligated as a matter of statutory construction to give effect to section 1141.01(C) because it was adopted later. See R.C. 1.52(A). We therefore conclude that section 1141.01(C) controls the board's decision without reference to section 1125.01.
 VII {¶ 64} Finally, Dade argues that the planning commission's refusal to grant Bradley Bay's request for permission to build the independent living units constituted a final adjudication on the merits which should have barred, by application of res judicata, Bradley Bay's request to the board for a special permit.
 {¶ 65} We can quickly dispose of this argument because res judicata does not apply when a city provides two separate means for relief from independent administrative bodies. The authority to issue a special use permit resides solely with the board. Likewise, only the planning commission has the authority to approve site plans. The power to either grant or deny the respective relief is not contingent upon the other administrative body. While we agree that principles of res judicata apply to zoning procedures, see Grava v. Parkman Twp.,73 Ohio St.3d 379, 1995-Ohio-331, those principles have no application here. Nothing in the city's laws prohibits a party whose site plans have been rejected from going to the board to seek a special use permit. And certainly, the criteria under which the planning commission and the board approach their respective tasks are different, so there is no mutuality of issues.
Judgment affirmed.
It is ordered that appellees recover of appellants their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, JUDGE*
CHRISTINE T. McMONAGLE, J., CONCURS
SEAN C. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY
* Sitting by Assignment: Judge Michael J. Corrigan, Retired, of the Eighth District Court of Appeals.
[1] The city repealed section 1141.01(C) by Ordinance 05-50, passed June 27, 2005.